IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SADIE L. COOK,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **No. 24-0431-KSM** |
| **CHRISTOPHER F. TUSTIN,** *et al.*, | |
| Defendants. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                    **July 17, 2024**

Plaintiff Sadie Cook brings claims under 42 U.S.C. § 1983 for false arrest and imprisonment, malicious prosecution, and abuse of process against Defendant Pennsylvania State Trooper Christopher F. Tustin.  (Doc. No. 11.)  Cook argues that Trooper Tustin violated her Fourth and Fourteenth[1] Amendment rights when he secured a state criminal complaint and arrest warrant for her on charges which were later dismissed.  (*Id.*)  Trooper Tustin has moved to dismiss the Amended Complaint in its entirety.  (*See* Doc. No. 12.)  Cook opposes that motion.  (Doc. No. 14.)  For the reasons discussed below, the motion is granted.

I.      **BACKGROUND**[2]

This case centers around the stolen identity of nonparty Christine Marine Seeley.

In October and November 2021, Seeley placed her Delaware County house for sale and held several house showings.  (Doc. No. 11 at ¶ 15.)  After one such showing, Seeley noticed

---

[1] In her Amended Complaint, Cook represents that all three claims arise under the Fourth Amendment, but as discussed below, *see infra* Part III.A.2, a constitutional claim for abuse of process arises under the Fourteenth Amendment.

[2] These facts are taken from Cook's Amended Complaint and the documents attached to that pleading, including Trooper Tustin's affidavit of probable cause.  (*See* Doc. No. 11.)

that the papers on her desk had been rummaged through, and she was missing a camera card that she had received from the Pennsylvania Department of Transportation (PennDOT) for purposes of renewing her driver's license. (*Id.*) On November 5, 2021, Seeley received a notice from her bank that a white woman with reddish hair had used what appeared to be Seeley's driver's license to withdraw $5,000 from Seeley's account. (*Id.*)

Seeley reported the crime, and Defendant Trooper Tustin from Pennsylvania's Vehicle Fraud Unit was assigned to the case. During his investigation, Trooper Tustin learned that the perpetrator had used Seeley's name and camera card to complete a license renewal form at PennDOT's driver's license center in Lawndale, Pennsylvania on November 4, 2021. (*Id.*) During that renewal, PennDOT took a photograph of the perpetrator, and on January 28, 2022, Trooper Tustin sent the photograph to several surrounding states for them to run against their own DMV records. (*Id.*) That same day, Maryland State Police informed Trooper Tustin that they "had a positive match" for the woman who took the November 4th photograph. (*Id.*)

In 2015, Maryland had issued a driver's license to Plaintiff Sadie Lee Cook. (*Id.*) In his probable cause affidavit, Trooper Tustin claimed that Cook's "2015 [Maryland driver's license] image was a match for [the perpetrator's November] 2021 picture." (*Id.*) After further investigation, Trooper Tustin discovered that three other states—Florida, Rhode Island, and Massachusetts—had also issued driver's licenses to a Sadie Lee/L. Cook/Jones/Dupuis. (*Id.*) Trooper Tustin's affidavit claims that the woman pictured on these licenses "is the same woman who portrayed herself as my victim in PA on November 4, 2021." (*Id.*) Trooper Tustin's affidavit also explains that "this woman used the same Social Security number in all five states"—Maryland, Florida, Rhode Island, Massachusetts, and Pennsylvania. (*Id.*) Based on this information, Trooper Tustin requested an arrest warrant for Cook, and one was issued. (*Id.*)

On February 2, 2022, local police arrested Cook at her Farmville, Virginia house for "identity theft, forgery, tampering with records, and tampering with records in Pennsylvania." (Doc. No. 11 at ¶¶ 6–8.)  Cook spent 18 days in a regional jail awaiting extradition to Pennsylvania, but when the Commonwealth failed to act on the extradition, she was released. (*Id.* at ¶ 13.)  Cook then retained counsel to represent her in the criminal matter, and on July 13, 2023, turned herself in to Pennsylvania authorities and was released on bail.  (*Id.* at ¶¶ 21–22.) At that bail hearing, she was given copies of the criminal complaint and the affidavit of probable cause underlying her criminal charges.  (*Id.* at ¶ 23.)

Cook returned to Pennsylvania for a preliminary hearing on August 4, 2023, and she was given a photo array that included two photographs of herself alongside the November 2021 photograph taken by the perpetrator who used non-party Seeley's identity.  (*Id.* at ¶ 34.) According to Cook, these photographs show that she and the perpetrator "have distinct and different facial features, including but not limited to the birthmark on Plaintiff's right cheek." (*Id.* at ¶ 35.)  In addition, although the criminal complaint identified the perpetrator as a 200-pound woman, Cook weighed 310 pounds at that time.  (*Id.* at ¶¶ 26, 30.)  Finally, Cook notes in her Amended Complaint that from October 18 to November 1, 2022 she had been undergoing and recovering from surgery in Virginia, and therefore, could not have attended a house showing in Pennsylvania during that time.  (*Id.* at ¶¶ 9, 28–29.)

At the August 4th hearing, Trooper Tustin offered to drop Cook's charges down to summary disorderly conduct if Cook agreed to plead guilty, but Cook refused.  (*Id.* at ¶¶ 36–37.) The magistrate judge then granted the Commonwealth's request for a continuance until September 15, 2023.  (*Id.* at ¶¶ 38–39, 41.)  When Trooper Tustin failed to appear for the

September 15th hearing, the Commonwealth requested another continuance, but the judge denied the request and dismissed the charges against Cook.  (*Id.* at ¶¶ 41, 44.)

On January 30, 2024, Cook filed this action, asserting several state and federal claims against Trooper Tustin.  (Doc. No. 1.)  In her Amended Complaint, Cook dropped her state law claims, but she continues to assert three claims against Trooper Tustin for Fourth and Fourteenth Amendment violations under 42 U.S.C § 1983:  (1) false arrest and imprisonment, (2) malicious prosecution, and (3) abuse of process.  (Doc. No. 11 at ¶¶ 50–70.)  Trooper Tustin now moves to dismiss the Amended Complaint in its entirety, arguing that Cook has failed to state a claim against him and that he is entitled to qualified immunity.  (*See* Doc. No. 12.)

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  Likewise, although a plaintiff does not need to include "detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks omitted); *see also Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017) (explaining that the court "must accept the allegations in the complaint as true, but [is] not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." (quotation marks omitted)).

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410,

1426 (3d Cir. 1997). "However an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Id.* (cleaned up). In addition, a court "may consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Keystone Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 95 (3d Cir. 2011) (quotation marks omitted).

## III.   DISCUSSION

Trooper Tustin contends that Cook's claims must be dismissed because she has failed to state a claim under § 1983, and because Trooper Tustin is entitled to qualified immunity. (Doc. No. 12.) The Court addresses each issue in turn.

### A.   Failure to State a Claim

As stated above, Cook brings her constitutional claims under 42 U.S.C. § 1983. Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983. "[T]o state a claim under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States, and second, that the alleged deprivation was committed or caused by a person acting under color of state law." *Jenkins v. Cordova*, Civ. No. 22-6482 (KM) (CLW), 2023 U.S. Dist. LEXIS 84428, *9 (D.N.J. May 15, 2023) (citing *Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011)).

Trooper Tustin does not dispute that Cook has adequately alleged he was acting under color of state law during the relevant period. Instead, he argues that Cook has failed to allege a constitutional violation. (Doc. No. 12 at 14–15.) He asserts that Cook's false arrest and

imprisonment claim and her malicious prosecution claim fail because Trooper Tustin had probable cause to attain an arrest warrant against Cook.  (*Id.* at 7.)  As for Cook's abuse of process claim, Trooper Tustin emphasizes that Cook has alleged that the prosecution against her was *not* legitimately initiated, and an abuse of process claim applies only when prosecution is initiated legitimately but later used for an improper purpose.  (*Id.*)  The Court addresses each issue in turn.

1.   **Fourth Amendment Claims for False Arrest and Imprisonment and for Malicious Prosecution**

The Court begins with Cook's claim for false arrest and imprisonment and her claim for malicious prosecution, both of which arise under the Fourth Amendment.

The Fourth Amendment provides that "the right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  To prevail on a false arrest and imprisonment claim brought pursuant to this Amendment, the plaintiff must show that the arresting officer lacked probable cause to seize the plaintiff.  *Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017).  Likewise, to succeed on a malicious prosecution claim, the plaintiff must show, among other things, that the defendant initiated the prosecution without probable cause.  *See Chiaverini v. City of Napolean*, 602 U.S. __, 144 S. Ct. 1745, 1748 (2024) ("To succeed on" a Fourth Amendment malicious prosecution claim "a plaintiff must show that a government official charged him without probable cause, leading to an unreasonable seizure of his person."); *see also Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017) (outlining elements of malicious prosecution claim).

Courts normally evaluate probable cause by asking whether a reasonable officer with knowledge of the facts and circumstances would have believed a crime had been committed.  *See*

*Zimmerman*, 873 F.3d at 418 (citation omitted).  Here, however, Trooper Tustin acted on an arrest warrant.  (Doc. No. 11 at ¶¶ 7, 53.)  Although warrants do not "shield" officers from liability in all circumstance, they do change the Court's analysis.  *See Goodwin v. Conway*, 836 F.3d 321, 327 (3d Cir. 2016).  Specifically, the Court looks to the affidavit of probable cause on which the warrant is based and asks whether within that affidavit, the officer knowingly or recklessly made a false statement or omission that was material to the probable cause finding.  *See Pinkney v. Meadville*, 95 F.4th 743, 748 (3d Cir. 2024).

Accordingly, to succeed on her claims, Cook must allege facts plausibly suggesting that: (1) Trooper Tustin "knowingly and deliberately, or with a reckless disregard for the truth, ma[d]e false statements or omissions that created a falsehood in applying for a warrant"; and (2) that these statements or omissions were "material, or necessary, to the finding of probable cause."  *Id.* (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)); *Iqbal*, 556 U.S. at 678.  The Court addresses each element in turn.

### a.   False Statements or Omissions

First, the Court must determine whether Trooper Tustin "knowingly and deliberately, or with a reckless disregard for the truth, ma[d]e false statements or omissions" in his affidavit of probable cause.  *Pinkney*, 95 F.4th at 748 (citation omitted).  This analysis changes depending on whether the plaintiff alleges omissions or misstatements by the officer.  *See Scuilli*, 853 F.3d at 698.

### i.   Omissions

An officer makes an omission with reckless disregard for the truth when they withhold a fact that "[a]ny reasonable person would have known. . . was the kind of thing the judge would wish to know."  *Id.* (citing *Wilson v. Russo*, 212 F.3d 781, 787–88 (3d Cir. 2000) (citation omitted)).  To determine whether an officer recklessly omitted information, courts ask whether

that information "bears on probable cause such that it should [have] be[en] presented to the magistrate [judge]." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 471 n.9.[3]  Although "negligent or innocent mistake[s]" do not undermine probable cause, *see Wilson*, 212 F.3d at 787 (citation and quotation omitted), there is otherwise no bright-line rule to determine which information should have been included, *see Dempsey*, 834 F.3d at 473.  Instead, courts consider the totality of the circumstances to distinguish between the relevant and the unremarkable.  *See id.*

     *Wilson* and *Dempsey* are illustrative of the line between relevant and irrelevant omissions.  *See Wilson*, 212 F.3d at 787–88; *Dempsey*, 834 F.3d at 473.  Beginning with relevant omissions, in *Wilson*, the Third Circuit found multiple omissions in an officer's probable cause affidavit that showed a reckless disregard for the truth.  212 F.3d at 787–88.  Notably, although a police report described the perpetrator as being between 6'3" and 6'5", the officer failed to mention in his affidavit that the plaintiff's driver's license abstract listed him as 5'11".  *Id.* at 788.  The officer also failed to mention that the victim did not identify the plaintiff in a photographic lineup.  *Id.*  The court found that a reasonable person would have known that a "significant height differential" and a victim's failure to identify the plaintiff were "the kind of thing[s] the judge would wish to know."  *Id.*

     Likewise, in *Dempsey* the Third Circuit held that an officer's affidavit charging the plaintiff with sexual harassment, simple assault, and disorderly conduct omitted several relevant facts.  *Dempsey*, 834 F.3d at 464, 473.  For example, the officer's affidavit did not mention that the plaintiff and the victim had engaged in playful wrestling on multiple occasions before the alleged assault or that the victim had been laughing when she left the room where the assault

---

[3] This does not mean that the omitted information would have necessarily altered the magistrate's probable cause determination.  *See Dempsey*, 834 F.3d at 471 n.9.

occurred.  *Id.* at 473.  The officer also omitted reports from witnesses in the nearby hallway as to what they heard when the plaintiff was in the room alone with the victim.  *Id.*  The Third Circuit found that these omissions were "pieces of information a reasonable person would know a magistrate would want to know given their relevance to [the] allegations."  *Id.*

In addition to these noteworthy omissions, *Wilson* and *Dempsey* also discussed *irrelevant* omissions, emphasizing that officers are not expected to provide the "entire history of events" and "every potentially evocative detail."  *Wilson*, 212 F.3d at 787–88; *see also Dempsey*, 834 F.3d at 474.  For instance, the *Wilson* court found that the officer's probable cause affidavit did not need to note that the plaintiff looked ethnically different from the other men in the photographic lineup because officers cannot "be expected to communicate the apparent ethnicity" of individual suspects, or "slight variations in appearance" "absent circumstances making these factors more important or prejudicial."  212 F.3d at 788.  Similarly, the court found that the officer's failure to flag that "the fact that height and weight [for each suspect] were not listed on the photo array" shown to the victim was "so routine as to be unremarkable to a judge." *Id.*  Finally, the *Dempsey* court emphasized that an omission is irrelevant where the officer did not know the omitted fact at the time they swore to the affidavit of probable cause.  *See* 834 F.3d at 473–74.

ii.    False Statements

In addition to omitting relevant information, an officer shows a reckless disregard for the truth when they include knowingly false statements in their probable cause affidavit.  *See Wilson*, 212 F.3d at 786–87.  An officer makes a false statement when they demonstrate a "willingness to affirmatively distort the truth," for example, if there is evidence that the officer either "entertained serious doubts as to the truth" or "had obvious reasons to doubt the accuracy" of their statements.  *Id.* at 788 (citation and quotations omitted).

In *Wilson*, for example, the officer asserted in his affidavit that a witness near the robbery scene had seen the plaintiff near the crime scene at around 3:00 p.m. *Wilson*, 212 F.3d at 785. But the witness actually told the officer that she saw the suspect half an hour before the police arrived, which would have been 3:30 p.m. *Id.* at 788. The officer thus had "obvious reasons to doubt" the truth of his statement that the witness had seen the suspect at around 3:00 p.m. *Id.* at 788–89; *see also Sherwood*, 113 F.3d at 400 (holding that an officer made a false assertion when they stated in their affidavit that they gave money to an informant and told the informant to buy drugs but, in reality, gave the money and instructions to a third, unmentioned party).

> ### b.  Materiality

If an officer recklessly omits information or makes a false statement, the court moves to the second step of the analysis and asks whether those omissions or false statements were "material, or necessary, to the finding of probable cause." *Wilson*, 212 F.3d at 787 (citation omitted). An omission or false statement is material "if a reconstructed warrant application containing the alleged omissions and excising the alleged inaccuracies would no longer establish probable cause." *Goodwin*, 836 F.3d at 327 (citing *Wilson*, 212 F.3d at 789).

To perform this analysis, the court begins by reconstructing the affidavit word-for-word—adding the omitted information and removing the false statements. *Dempsey*, 834 F.3d at 470. The court then asks whether, considering the reconstructed affidavit, probable cause would still have existed for the warrant to issue. *Id.* Probable cause exists if a reasonable officer with knowledge of the facts and circumstances would have believed a crime had been committed. *See Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995). This standard demands something more than "mere suspicion", *id.* at 482, but it is "significantly lower than the standard which is required for conviction," *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005) (citations omitted).

As part of this analysis, courts also consider whether there is "'[i]ndependent exculpatory evidence' . . . that 'outweigh[s]' the probable cause otherwise established by the affidavit . . . ." *Dempsey*, 834 F.3d at 479 (quoting *Wilson*, 212 F.3d at 790).  Though officers cannot "disregard plainly exculpatory evidence," *Wilson*, 212 F.3d at 790 (citation omitted), there is no rigid test to determine probable cause.  *See Dempsey*, 834 F.3d at 467–68.  Rather, the probable cause analysis is "fluid" and turns on the facts of the case.  *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).

c.    Analysis

Trooper Tustin argues that the Court should dismiss Cook's claims for false arrest and imprisonment and for malicious prosecution because Cook has failed to allege that the affidavit of probable cause supporting the arrest warrant contains material omissions and/or false statements.  (Doc. No. 12 at 17.)  The Court agrees.

i.    Identifying the Omissions and Misstatements[4]

The Amended Complaint identifies three categories of omissions and misstatements. First, Cook claims that Trooper Tustin's affidavit failed to "reflect that Defendant Tustin compared the 'photo match' from the Maryland State Police with the PennDOT photo taken by the perpetrator."  (Doc. No. 11 at ¶ 55.)  But this allegation is inconsistent with Trooper Tustin's affidavit.  (*See id.*, Ex. A at 15–16.)  In that affidavit, Trooper Tustin attests that he sent the

---

[4] In her Amended Complaint, Cook claims that Trooper Tustin's affidavit lacked probable cause. (Doc. No. 11 at ¶ 54.)  Although at this stage the Court takes Cook's factual allegations as true, Cook's allegation that Trooper Tustin lacked probable cause is "in reality . . . a legal conclusion . . . pleaded as a factual assertion, which is not entitled to a presumption of truth."  *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012) (citing *Iqbal*, 556 U.S. at 678); *see also Gebhart v. Steffen*, 574 F. App'x 156, 159 (3d Cir. 2014) (holding that a plaintiff's assertion that officers lacked probable cause was a legal conclusion).  Accordingly, the Court does not consider Cook's conclusory assertion in deciding this motion and instead focuses on Cook's allegations that Trooper Tustin omitted relevant information or made false statements in his probable cause affidavit.

driver's license photograph taken by the perpetrator to states surrounding Pennsylvania on
January 28, 2022.  (*Id.* at 15.)  That same morning, Trooper Tustin received an email from
Maryland State Police stating that they found a "match" from a 2015 Maryland driver's license
issued to Sadie Lee Cook.  (*Id.* at 14–15.)  According to the affidavit, Cook's "2015 image was a
match for my Victim's [November] 2021 picture."  (*Id.* at 15.)  This statement suggests that
Trooper Tustin did, in fact, compare the two photos.

Next, Cook asserts that while the criminal complaint identified the perpetrator as a 200-
pound woman, Cook weighed about 310 pounds at the time.  (Doc. No. 11 at 26, 30.)  Even
assuming this weight difference is something a magistrate judge would want to know, it is not a
relevant omission because Cook has not alleged that Trooper Tustin knew about the weight
difference when he completed the affidavit.  (*See generally id.*)  As noted above, officers cannot
recklessly omit information which they themselves do not know.  *See Dempsey*, 834 F.3d at 473–
74.

Last, Cook asserts that Trooper Tustin failed to indicate in his affidavit that "Plaintiff and
the perpetrator have distinct and different facial features, including but not limited to the
birthmark on Plaintiff's right cheek."  (Doc. No. 11 at ¶ 35.)  According to Cook, this fact points
to both an omission and a potentially false statement in Trooper Tustin's affidavit.[5]  The Court
agrees.  First, Cook's distinctive facial features are things "[a]ny reasonable person would have
known . . . was the kind of thing the judge would wish to know."  *Scuilli*, 853 F.3d at 698

---

[5] The Court may view an affidavit as containing both an omission and a misrepresentation as to
the same fact.  *See Scuilli*, 853 F.3d at 695–99.  In *Scuilli*, an officer reported that the victim had
described the suspect's car as a red, four-door sedan.  *Id.* at 695–96. The officer's affidavit continued by
stating that, the following day the victim "spotted this same vehicle described above."  *Id.* at 696.  In
reality, the victim's second sighting was of a red, three-door coupe, which the officer knew was not a
four-door sedan.  *Id.* at 695, 699.  The Third Circuit treated the affidavit as containing a false statement
*and* an omission, striking the portion of the affidavit that stated the second spotting involved "this same
vehicle described above," and replacing it with the phrase, "a vehicle, a red three-door coupe."  *Id.* at 700.

(quotation marks omitted).  Though not as striking as a several-inch height difference or a witness's failure to identify the plaintiff in a lineup, different facial features (and in particular, the existence of a facial birthmark) "bear[ ] on probable cause such that it should [have] be[en] presented to the magistrate."  *Dempsey*, 834 F.3d at 471 n.9.

In addition to omitting any mention of the birthmark and slight difference in facial features, Trooper Tustin states in his affidavit of probable cause that Cook's Maryland, Florida, Massachusetts, and Rhode Island driver's license photographs were a match to the perpetrator's November 4th photograph.  (Doc. No. 11, Ex. A at 16 (attesting that the woman depicted in the Florida, Massachusetts, and Rhode Island driver's licenses is the "same woman that portrayed herself as my victim on November 4, 2021 in PA")).)  If Cook has distinctive facial features—an allegation the Court accepts as true at this time—then, Trooper Tustin's statement that the photographs were a "match" is one where he would have had "obvious reasons to doubt" its accuracy.  *Wilson*, 212 F.3d at 788.

Because Cook sufficiently alleged an omission and a false statement in Tustin's affidavit, the question becomes whether either was material.

ii.    Materiality

As noted above, the Court must first reconstruct Trooper Tustin's affidavit to include the alleged omission and remove the alleged false statements:

> On January 28, 2022, I sent the digital photo taken on November 4, 2021 at the Lawndale PennDOT drivers [sic] license center to the states surrounding Pennsylvania. I asked them to run the photo against their DMV records to see if there were any matches. On that day at 1130 hours, I received an email from the Maryland State Police saying that they had a positive match for the woman that took the photo on November 4th pretending to be my victim.
>
> On August 8, 2015, the State of Maryland issued OLN C200758497425 to Sadie Lee COOK with a date of birth of 06/06/75. [**Despite some different facial features, including a**

**birthmark on Cook's right cheek,**] COOK's 2015 image **[appears similar to**] ~~a match for~~ my Victim's 2021 [**Pennsylvania**] picture. Through further investigation I discovered 3 other States that had issued the same woman a driver's license or ID.

On July 22, 2008, the State of Florida issued OLN D-120-792-75-706-0 to Sadie Lee DUPUIS with a date of birth of 06/06/75. ~~A query of this photo is the same woman~~ [**The woman in the photo appears similar to the woman**] that portrayed herself as my victim on November 4, 2021 in PA.

On an unknown date, the Commonwealth of Massachusetts issued OLN S48081673 to Sadie L DUPUIS with a date of birth 06/06/75. The woman pictured on this driver's license ~~is the same woman~~ [**appears similar to the woman**] who portrayed herself as my victim on November 4, 2021 in PA.

On June 04, 2004, the State of Rhode Island issued OLN 9810805 to Sadie Lee JONES with a date of birth of 06/06/75. The woman pictured on this driver's license ~~is the same woman~~ [**appears similar to the woman**] who portrayed herself as my victim on November 4, 2021 in PA.

This woman used the same Social Security number in all 5 states, ending in 9099. There were no variations of this SSN.

The Information contained within this document is true and accurate to the best of my knowledge. I ask that an arrest warrant be issued for the woman named in this Affidavit.

(Doc. No. 11 at 15–16.)

With this reconstructed affidavit in mind, the Court asks whether the affidavit independently establishes probable cause for the arrest warrant against Cook. Several facts in the affidavit lead the Court to answer that question in the affirmative. First, the affidavit shows that Trooper Tustin received an email from the Maryland State Police—an independent law enforcement agency—saying that Cook's Maryland driver's license photograph was a match for the driver's license photograph taken by the perpetrator. (Doc. No. 11, Ex. at 15.) Second, Trooper Tustin' additional investigation revealed driver's licenses from Florida, Massachusetts, and Rhode Island issued to Sadie Lee Dupuis, Sadie L. Dupuis, and Sadie Lee Jones,

respectively.  (*Id.* at 16.)  Each license had a photograph of a woman who looks similar to the perpetrator.  (*Id.*)  Both Cook and the perpetrator have the same "reddish" hair color and similar facial structures, and any differences in their facial features are difficult to discern given that the perpetrator was wearing glasses and had her hair down, while Cook's photos were taken without glasses[6] and with her hair pulled back.  (*Id.*, at Ex. B.)  The lack of a birth mark on the woman depicted in the January 2024 photograph does not undermine a finding of probable cause because the mark could have, for instance, been covered with makeup.  Finally, and most notably, the same social security number was used to get all five driver's licenses, including the fraudulently acquired Pennsylvania license.  (*Id.*)

A reasonable officer with knowledge of these facts would have believed that Cook committed the crimes with which she was charged.  *See Orsatti*, 71 F.3d at 483 (discussing probable cause standard); *see also* 18 Pa. Stat. & Cons. Stat. § 4120(a) ("A person commits the offense of identity theft of another person if [s]he possesses or uses, through any means, identifying information of another person without the consent of that other person to further any unlawful purpose."); *id.* § 4101(a)(1) ("A person is guilty of forgery if, with intent to defraud or injure anyone, or with knowledge that [s]he is facilitating a fraud or injury to be perpetrated by anyone, the actor:  alters any writing of another without his authority."); *id.* § 4104(a) ("A person commits a misdemeanor of the first degree if, knowing that [s]he has no privilege to do so, [s]he falsified, destroys, removes or conceals any writing or record, or distinguishing mark or brand or other identification with intent to deceive or injure anyone or to conceal any wrongdoing."); *id.* § 4911(a)(3) ("A person commits an offense if [s]he:  intentionally and unlawfully destroys,

---

[6] The use of glasses by the perpetrator is neither here nor there, given that many people who wear glasses also wear contacts and someone could easily use non-prescription glasses to veil their identity.

conceals, removes or otherwise impairs the verity or availability of any such record, document or thing.").

In sum, even if the Court adds the information about Cook's distinctive facial features and removes Trooper Tustin's assertion that the woman pictured on these licenses was "the same," the affidavit would have still established probable cause. Cook's distinctive facial features, including a small birthmark, are not sufficiently exculpatory as to outweigh the inculpatory evidence, which included a match by the Maryland State Police and the use of the same social security number in each instance. *See Wilson*, 212 F.3d at 790, 791–92 (finding the officer's failure to mention a several-inch height difference was not material). Accordingly, the Court finds Trooper Tustin's alleged omission and false statement were not material.

*   *   *

Because the arrest warrant was supported by probable cause, Cook fails to state a plausible Fourth Amendment claim for false arrest and imprisonment or for malicious prosecution and the Court grants the motion to dismiss as to these claims.

### 2.   Abuse of Process Claim

That leaves Cook's claim for abuse of process. This claim is founded in the Fourteenth Amendment's Due Process Clause. *See, e.g.*, *Jennings v. Shuman*, 567 F.2d 1213, 1220 (3d Cir. 1977) ("An abuse of process is by definition a denial of procedural due process."). "[A] section 1983 claim for malicious abuse of process lies where prosecution is initiated legitimately and thereafter is used for a purpose other than that intended by law." *Rose v. Bartle*, 871 F.2d 331, 350 n.17 (3d Cir. 1989). In other words, the claim centers not on the "wrongful procurement of legal process" but rather on the "misuse of process." *Dunne v. Township of Springfield*, 500 F. App'x 136, 139 (3d Cir. 2012) (citing Restatement (Second) of Torts § 682 cmt. a (Am. L. Inst. 1977)). "Incidental motive[s] or spite[s] or ulterior purpose[s]" are not enough to show a misuse

16

of process, and a defendant is not liable if they have done "nothing more than carry out the process to its authorized conclusion." *Napier v. City of New Castle*, 407 F. App'x 578, 582 (3d Cir. 2010) (citations and quotations omitted).  Instead, "[t]he usual case of abuse of process is one of some form of extortion, using the process to put pressure upon [the accused] to compel him to pay a different debt or to take some other action or refrain from it."  Rest. 2d Torts § 682 cmt. b.

Trooper Tustin argues that Cook's abuse of process claim must be dismissed because she alleges that the prosecution against her was *not* legitimately initiated, a fact which would preclude an abuse of process claim.  (Doc. No. 12 at 20–21.)  Trooper Tustin is correct.  As explained above, an abuse of process occurs when a "prosecution is *initiated legitimately* and thereafter [ ] used for a purpose other than that intended by the law."  *Napier*, 407 F. App'x at 582 (cleaned up) (emphasis added); *see also Napier v. City of New Castle*, Civil Action No. 06-1368, 2007 WL 1965296, at *6 (W.D. Pa. July 3, 2007) ("As plaintiff has acknowledged, a claim for abuse of process differs from a malicious prosecution claim in that a malicious prosecution claim has to do with the wrongful initiation of the legal process, i.e., without probable cause and with a bad motive, whereas an abuse of process arises when a prosecution is initiated legitimately but thereafter is used for a purpose other than that intended by law." (quotation marks omitted)).  As such, courts consistently dismiss abuse of process claims premised, like Cook's, on the assertion that an officer was "merely continuing to pursue a claim that was initiated with malice."  *Napier*, 2007 WL 1965296, at *6; *see also, e.g.*, *Evans v. Durham Life Ins. Co.*, No. CIV. A. 00–281, 2001 WL 770803, at *2 (E.D. Pa. July 9, 2001).

Cook does not dispute Trooper Tustin's reading of the law, but instead, argues that the Court should view her claim for abuse of process as an alternative count, which assumes the

prosecution against her was legitimately initiated but was later improperly continued.  (Doc. No. 14 at 13–14.)  The Court grants that request.  *See* Fed. R. Civ. P. 8(d) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."); Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice.").

So read, Cook claims that Trooper Tustin committed an abuse of process by "continu[ing] to prosecute her" after she showed him "evidence that she was not [the] perpetrator."  (Doc. No. 11 at ¶¶ 66–67.)  Cook does not explain what evidence she showed Trooper Tustin or how it leads to the conclusion that Trooper Tustin continued the prosecution because he "was unwilling to admit that he made a mistake."  (*Id.* at ¶¶ 68–69.)  But even assuming that Trooper Tustin continued the prosecution because he did not want to concede a mistake, this reason on its own does not state a constitutional claim for abuse of process.

The Third Circuit's discussion in *Napier v. City of New Castle* is illustrative.  In that case, a narcotics officer observed a confidential informant buy drugs from someone who shared the plaintiff's name.  407 F. App'x at 580.  The officer later examined the plaintiff's driver's license photograph and determined that she was the woman who sold the drugs to the informant.  *Id.* But when the officer arrested the plaintiff three months later, he noticed that her hair style and weight were different.  *Id.*  According to the plaintiff, the officer knew that she was not the person he had seen selling the drugs, but he nevertheless continued the prosecution because he "just didn't want to look embarrassed in front of his peers by admitting he had the wrong person."  *Id.* at 581–82.  The district court dismissed the plaintiff's abuse of process claim, and the Third Circuit affirmed, explaining that "there is no liability where the defendant has done

18

nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Id.* (citation omitted) (cleaned up); *see also Evans*, 2001 WL 770803, at *2 ("It is not enough that the defendant had bad or malicious intentions or that the defendant acted from spite or with an ulterior motive.  Rather, there must be an act or threat not authorized by the process, or the process must be used for an illegitimate aim.  There is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." (quoting *AI Hamilton Contracting Co. v. Cowder*, 644 A.2d 188, 191 (Pa. Super. Ct. 1994))).

Like the plaintiff in *Napier*, here, Cook has not shown that Trooper Tustin *used* the prosecution for an improper purpose, such as extortion.  *See* Rest. 2d Torts § 682 cmt. b; *see also Jennings v. Shuman*, 567 F.2d 1213, 1219 (3d Cir. 1977) ("If the defendant . . . uses the threat of prosecution for purposes of extortion, this is malicious abuse" of process.); *Bristow v. Clevenger*, 80 F. Supp. 2d 421, 431 (M.D. Pa. 2000) ("Courts have held that when process is used to effect an extortionate demand, or to cause the surrender of a legal right, or is used in any other way not so intended by proper use of the process, a cause of action for abuse of process can be maintained." (quotation marks omitted)).  To the contrary, Cook's allegations suggest that she and Trooper Tustin had competing evidence as to whether she was the perpetrator, and the state court proceedings were continued "to determine whether [Cook] was guilty of the offenses in question, which is precisely the purpose intended by the law." *Dunne*, 500 F. App'x at 139 (quotation marks omitted).  And even accepting Cook's allegation that Trooper Tustin continued the prosecution solely because he did not want to concede a mistake, "[m]erely carrying out the process to its authorized conclusion, *even with bad intentions*, is not abuse of process." *Mawson v. Pittston City Police Dep't*, CIVIL NO: 3:16-CV-00400, 2017 WL 4324840, at *17 (M.D. Pa.

Jan. 20, 2017) (emphasis added); *see also Napier*, 407 F. App'x at 582 (explaining that "[i]ncidental motive[s] or spite[s] or ulterior purpose[s]" are not enough where defendants have done "nothing more than carry out the process to its authorized conclusion"); Rest. 2d Torts § 682 cmt. b (explaining that "there is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant").

Because Cook has not alleged any facts from which the Court can find that Trooper Tustin used the continued criminal prosecution for an improper purpose, the Court also dismisses Cook's claim for abuse of process.

### B.     Qualified Immunity

Because Cook has failed to sufficiently allege that Trooper Tustin violated a constitutional right, the Court does not need to analyze whether he is entitled to qualified immunity.  *See Wilson*, 212 F.3d at 792.

## IV.     CONCLUSION

For the reasons discussed above, Trooper Tustin's motion to dismiss is granted, and Cook's § 1983 claims are dismissed without prejudice.  *See Phillips*, 515 F.3d at 245.  Cook will be given an opportunity to submit a second amended complaint to the extent she can in good faith cure the deficiencies identified in this Memorandum.  An appropriate order follows.